**CITY OF PHILADELPHIA and Philadelphia Gas Works by Philadelphia Facilities Management Corporation and Philadelphia Facilities Management Corporation, Petitioners**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

**PECO Energy Company, Petitioner**

v.

**Pennsylvania Public Utility Commission, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 4, 2003.
Decided March 31, 2003.

---

Eleanor Ewing, Philadelphia, for petitioners.

Ward L. Smith, Philadelphia, for petitioner, PECO Energy Co.

William Blair Hopkin, Harrisburg, for respondent.

Jason D. Sharp, Harrisburg, for intervenor, Dept. of Transportation.

BEFORE: PELLEGRINI, Judge, COHN, Judge, and FLAHERTY, Senior Judge.

OPINION BY JUDGE PELLEGRINI.

The City of Philadelphia (City) and Philadelphia Gas Works (PGW) appeal from an order of the Pennsylvania Public Utility Commission (Commission) adopting the recommended decision of the administra-

tive law judge (ALJ) allocating each of them 100% of their relocation costs relative to the reconstruction of the Holme Avenue Bridge. Similarly, PECO Energy Company (PECO) appeals from that same order allocating it 100% of its relocation costs relative to the reconstruction of the Holme Avenue Bridge.

This case involves the deterioration and proposed reconstruction of the Holme Avenue Bridge (Bridge) where Holme Avenue crosses above the railroad tracks of Consolidated Rail Corporation (Conrail). The Bridge, which was constructed sometime between 1919 and 1921 and became a state bridge in 1961, is located in a residential neighborhood in the Pennypack section of the City.

On December 14, 2000, the Commonwealth of Pennsylvania, Department of Transportation (PennDot) filed an application with the Commission requesting, *inter alia,* approval to remove and replace the Bridge (Bridge Replacement Project) and for the Commission to allocate costs associated with the Bridge Replacement Project. In determining cost allocations, PennDot wanted the Commission to consider that the City owned a water main, sanitary sewer and storm sewer located near the Bridge, and PGW owned a gas main located on the Bridge, all which needed to be relocated and possibly changed, altered or adjusted. Also, PECO had two 45–foot terminal poles located on Holme Avenue which needed to be relocated in order to accommodate the Bridge Replacement Project.

At the hearing before the ALJ, William Messenger (Messenger), a structural engi-

neer, initially testified on behalf of Penn-Dot regarding the deteriorated condition of the Bridge and opined that rehabilitation or reconstruction of the Bridge was not viable. Regarding the construction of the new Bridge, Messenger estimated the total cost of the Bridge Replacement Project to be approximately $2.3 million, which included an estimated construction cost for the Bridge alone of $1.7 million and $300,000 as a contingency item. Messenger testified that due to the placement of a new abutment that would be situated right on top of the existing sanitary and storm sewers, the sewers would have to be relocated, and the costs of relocating the sewers was not included in the $1.7 million estimate. He stated that he did not know what those costs would be.

Leonard Nardone (Nardone) also testified on behalf of PennDot stating that he worked for PennDot as the railroad coordinator for the district. He testified that the Bridge Replacement Project would utilize 80% federal and 20% state Bridge bill funds with a separate 10% contribution from Conrail for "project costs" pursuant to an agreement between PennDot and Conrail.[1] He also testified that PennDot would bear 100% of the storm water relocation costs because it provided drainage for the highway, but it would not cover any costs for the relocation of the sanitary and storm sewers because they were in a public right-of-way; therefore, the utilities had to move the sewers at their own costs. Nardone further stated that upon completion of the Bridge, PennDot would be the owner of the Bridge and would maintain, at its sole cost and expense, the Bridge superstructure and substructure and the

1. Under the agreement dated February 26, 1991, "project costs" were defined as "the total cost of the Bridge and includes costs of preliminary and final engineering, construction, and construction engineering, but does not include the costs of the approaches to the Bridge, acquisition of necessary rights-of-way or costs of adjustment and/or relocation of non-carrier utilities." Under the agreement, project costs also included Conrail's cost of flagmen, inspection and Conrail force account work.

roadway between curbs on the Bridge and its approaches, and the structural integrity of the curbs and sidewalks following construction. He concluded by stating that PennDot did not agree to bear any costs of any non-carrier public utility other than the costs of relocating the City's storm water facility.

Mark Waas (Waas), an engineering supervisor for the design branch of the Water Department of the City, testified that the City's Water Department had three facilities at the existing crossing: a 12″ cast iron water main located on the Bridge superstructure installed in 1996; a 10″ vitrified clay sanitary sewer below the grade of the Bridge superstructure and crossing beneath the existing railroad tracks installed in 1955; and an 18″ concrete storm sewer below the grade of the Bridge superstructure and crossing beneath the existing railroad tracks installed in 1955. Waas testified that all three facilities had an unlimited useful life with continued proper maintenance. However, in order to accommodate the Bridge Replacement Project, the City's water main on the Bridge superstructure might have to be reconstructed because the City had inspected the storm water main and discovered that the storm water line west of the Bridge was crushed in places and inoperable. He estimated the total cost of reconstructing the water main to be $101,250, but noted that the Bridge was the most convenient location in the general vicinity for the location of the water main. Waas stated that there had been no cost sharing on the Bridge Replacement Project and it was PennDot's responsibility as owner of the Bridge to bear the costs of relocation or reconstruction of the sewers. It was also Waas' opinion that the 12″ water main was located in a public right-of-way while the 10″ sanitary and 18″ storm sewers were located in private right-of-ways.

Michael Jones (Jones), the manager for distribution planning, testified on behalf of PGW. He explained that PGW had a 12–inch steel intermediate pressure main on the Bridge, which had been installed in 1956 and had an indefinite service life but required constant inspection, and that PGW needed the main to remain in service at all times so that it could serve its customers downstream. He stated that PGW had not submitted any requests of cost sharing, and it was PGW's position that it was not going to pay for relocation or replacement costs [2] because it would be difficult and costly to relocate to any other location off the Bridge. Jones testified that PGW wanted PennDot to pay 100% of any relocation costs, but that PGW would agree to maintain its gas facility as redesigned and relocated if PennDot and PGW reached a consensus on the final design and relocation of the gas facility.

Finally, Serena Wilson (Wilson), a project engineer for PECO, testified that PECO had two 45–foot terminal poles located on Holme Avenue that had to be relocated in order to accommodate the Bridge Replacement Project at a total estimated cost to PECO of $80,344. She stated that PECO agreed to bear the initial cost of relocating its poles, but sought to be reimbursed 100% by PennDot, and that PECO also agreed to solely bear the cost of maintaining its facilities after the Bridge Replacement Project was completed.

After the hearing, the ALJ recommended that the Commission approve PennDot's request to replace the Bridge because none of the parties disagreed with Messenger's assessment that the Bridge

---

2. PennDot indicated that in replacing the Bridge, the gas main might need to be replaced with a 12″ steel main on the new Bridge.

needed to be replaced. Regarding the cost allocations, the ALJ considered the benefit the utilities and their ratepayers received from the location of their facilities, whether any party was responsible for the deterioration of the Bridge, the availability of state and/or federal funding, the equities involved, and consistency with recent Commission decisions. The ALJ recommended that the Commission approve the allocation between PennDot and Conrail because it was just and reasonable.

As for the allocation of costs between PennDot, the City and PGW, the ALJ recommended that the City and PGW bear 100% of the cost and expense of any relocation, change, alteration or adjustment of their facilities in order to accommodate the Bridge Replacement Project. He determined that their facilities existed in a public right-of-way and that both parties had received substantial benefits as a result of the location of their facilities.[3] In addition, the ALJ recommended that the City be allocated 100% of the cost and maintenance responsibility for the sidewalks on the Bridge. As for PECO, the ALJ also recommended that it bear 100% of the cost and expense of the relocation of the two 45–foot terminal poles because it had bene-

fited from the location of the poles and would benefit from the relocation as well. In addition to considering the benefit the utilities received, the ALJ determined that PennDot was not responsible for the deterioration of the Bridge, that state and federal funding was not available,[4] and that it was not equitable for PennDot to pay all of the relocation costs.

■ The City, PGW and PECO filed exceptions to the ALJ's recommended decision. The City and PGW argued, *inter alia,* that the ALJ failed to acknowledge that the City's storm water sewer, sanitary sewer and gas mains were not within the public right-of-way, and that the ALJ erred in concluding that if federal funds were used to pay for relocation costs, there would be less federal funds available for other projects. PGW argued that the ALJ failed to take into consideration all relevant factors when allocating costs. The Commission denied all of the exceptions and adopted the ALJ's recommended decision. The City and PGW filed an appeal with this Court from the Commission's decision as did PECO in a separate appeal. Their appeals have been consolidated for our review.[5]

---

3. The ALJ noted that neither the City nor PGW produced any evidence that they paid for the use of the right-of-way or paid taxes on the property where their facilities were located or that they had to purchase the right-of-way. That being the case, citing an unappealed Commission decision, the ALJ explained:

> [U]tilities routinely relocate their facilities from public right-of-way in instances where the Commission is not involved and, do so at their own cost and expense. One wonders if facility relocations are so burdensome to utilities, why locate them in the public right-of-way. The answer is obvious. It is in the utilities' interest to locate in the public right-of-way. The utilities do not have to buy the right-of-way, pay any taxes on the property, or maintain the right-of-way ... The utilities weigh those benefits

against possible relocation costs when they decide to locate their facilities in the public right-of-way.
(ALJ's April 3, 2002 decision at 16.)

4. Regarding state and federal funding, the ALJ agreed with PennDot that absent a cost sharing agreement, PennDot was not obligated under state law to reimburse the City and PGW for their relocation costs, but would be required to do so under state law if the Commission so ordered. PennDot could then seek federal funding; however, if federal funds were used, that would decrease the amount of federal funds that would otherwise be available for other important highway improvement projects.

5. Our scope of review of the Commission's order is limited to determining whether the

## I.

The City, PGW and PECO contend that the Commission erred by failing to consider all relevant factors when allocating relocation costs to reach an unjust and unreasonable result because it only considered one factor—the benefit to a utility and its ratepayers from locating within a public right-of-way—and nullified all the other factors through unsupported findings of fact. They argue that the Commission's decision gave deference to PennDot's current policy that utilities solely bear the costs of relocation and essentially was a *de facto* return to the common law rule that has been superseded by the mandate to consider all of the relevant factors when allocating costs. Instead, they argue that the Commission should have also considered the following relevant factors: 1) availability of state and federal funding; 2) placing the costs upon the party responsible for the situation; and 3) the equities of the case. They also argue that although the Commission considered the benefits they would receive from relocating their facilities, it did not consider the detriment to them in doing so.

These precise arguments were previously made in *PECO Energy Co. v. Pennsylvania Public Utility Commission*, 568 Pa. 39, 791 A.2d 1155 (2002). In that case, PennDot filed an application with the Commission to reconstruct Delaware Avenue in the City of Philadelphia, to remove old railroad tracks and to effect base repairs, drainage improvements and resurfacing. The application was approved and because PECO maintained facilities within the public right-of-way inside the project area, its facilities had to be relocated at its own costs. When PECO sought reimbursement, PennDot refused because it

had not applied for any federal funding to cover relocation costs of non-municipal public utilities. After a hearing, the ALJ issued a recommended decision that PennDot should reimburse PECO for its costs, basing his decision on the following facts: 1) benefits received by the utility and its ratepayers; 2) the availability of state and/or federal funds for the project; 3) the party responsible for the situation; and 4) additional equities. PennDot filed exceptions and the Commission concluded that the ALJ's decision was not reasonable and ordered PECO to pay its own costs. The Commission based its decision on the fact that PECO received a substantial benefit from the location of its facilities in the public right-of-way, there were no federal funds available to reimburse PECO, PennDot was not required to wait until PECO's facilities had reached the end of their useful lives to undertake the project and the decision was consistent with previous Commission adjudications. On appeal, we vacated the Commission's order and remanded the matter after concluding that the Commission abused its discretion by considering the reasons underlying the abrogated common law rule.

A petition for allowance of appeal was granted with the following issue raised:

In the instant matter, PECO asserts that the Commission erroneously relied on the abrogated common law rule as the sole factor underpinning its decision. PECO complains that the determination by the Commission that PECO's ratepayers should bear the burden of its relocation costs because PECO has received, and continues to receive, substantial benefits from the location of its facilities in public rights-of-way, simply resurrects the old common law rule that

---

Commission's findings are supported by substantial evidence, whether an error of law has been committed or whether constitutional

rights have been violated. *Bell Atlantic v. Pennsylvania Public Utility Commission*, 672 A.2d 352 (Pa.Cmwlth.1995).

utilities that occupy public rights-of-way are not entitled to compensation if forced to relocate their facilities because of rail-highway improvement projects. *Id.* at 51, 791 A.2d at 1162–1163. Our Supreme Court first discussed the history of the current statute and the Commission's role in allocating costs. The Court initially explained that at common law, non-transportation utilities were permitted to occupy highway rights-of-way without cost, but could be ordered by the state or municipality to remove and relocate their facilities at the utilities' own costs.[6] The enactment of the Public Service Company Law in 1913,[7] the predecessor to the present Public Utility Code (Code),[8] incorporated this common law rule, but the Public Utility Law of 1937,[9] which superseded the Public Service Company Law, did not. Nonetheless, the Court stated that cases decided under the 1937 Law continued to rely upon the common law rule. However, in 1963, the statute was amended to provide that relocation costs in rail-highway construction projects would be paid by the public utilities, municipal corporations, or by the Commonwealth in such proportions as the Commission determined. The Court explained that this amendment had been enacted with the intent to replace the common law rule with a discretionary allocation by the Commission in all cases except where the parties executed an agreement allocating costs. Further, the current consolidated statutes did not change the provision giving the Commission discretionary authority to allocate utility relocation costs in any proportion it determines.

As to the method used in allocating relocation costs, the Court referred to Section 2702(b) of the Code, 66 Pa.C.S. § 2702(b),[10] and Section 2704(a) of the Code, 66 Pa.C.S. § 2704(a),[11] which vests the Commission with exclusive power to approve the construction and allocation of costs in projects involving rail-highway crossings. The

6. The Court stated:
 The benefits to the utilities in locating along public rights-of-way were significant because, although they obtained no property rights in the highway right-of-way, they were not required to purchase expensive private rights-of-way or pay fees, taxes or upkeep for locating their facilities there. Thus, the basis for the common law rule was that, although the utility was permitted to use the right-of-way because it served a public interest, the primary purpose of the public easement was the public's own use; any use by a public utility was subordinate to the interest of the public.
 *Id.* at 47, 791 A.2d at 1160.

7. Act of July 26, 1913, P.L. 1374, No. 854, art. V, § 12, which was repealed in 1937, required a utility "at its own expense" to relocate, change or remove its facilities as directed by the Commission.

8. 66 Pa.C.S. §§ 101–3316.

9. Act of May 28, 1937, P.L. 1053, *as amended,* 66 P.S. § 1101 *et seq.*

10. Section 2702(b) of the Code provides in relevant part:

 The Commission is hereby vested with exclusive power ... to determine and prescribe, by regulation or order, the point at which, and the manner in which, such crossing may be constructed, altered, relocated, suspended or abolished, and the manner and conditions in or under which such crossings shall be maintained ...

11. Section 2704(a) of the Code, 66 Pa.C.S. § 2704(a), further provides in relevant part:

 The cost of construction, relocation, alteration, protection, or abolition of such crossing, and of facilities at or adjacent to such crossing which are used in any kind of public utility service, shall be borne and paid, as provided in this section, by the public utilities or municipal corporations concerned, or by the Commonwealth, in such proper proportions as the Commission may, after due notice and hearing, determine ...

Court then stated that the Commission was not confined to consider any one particular formula but had to consider all relevant factors limited only by the fundamental requirement that its decision be just and reasonable, and it could not impose a mandatory, exclusive list of considerations upon the Commission.[12] Further, if the result was the same as the application of the abrogated common law rule, it was not improper where the Commission based its decision upon the consideration of specific and relevant factors.

 Our Supreme Court ultimately determined that the factors relied upon by the Commission—1) whether the utility received a substantial benefit from the location of its facility; 2) whether federal funds were available to reimburse PECO; 3) whether PennDot had caused the need for the reconstruction of Delaware Avenue; and 4) whether the Commission's decision was consistent with previous adjudication

on this issue—were relevant to the matter and the Commission did not place blind adherence on the abrogated common law rule. The Court concluded by stating:

> While not determinative in a cost allocation matter, the respective historic and prospective benefits that a utility and its ratepayers enjoy from the placement of utility facilities in a public right-of-way is one factor among many that may be considered by the Commission in a cost allocation proceeding. It is only necessary that the Commission consider all relevant facts, render a decision that is just and reasonable, and one supported by substantial evidence.

*Id.* at 56, 791 A.2d at 1166.[13] Based on our Supreme Court's holding in *PECO Energy,* we must determine whether the Commission relied upon all of the relevant factors in makings its decision and, in turn, did not blindly adhere to the abrogated common law rule.[14]

12. The Court noted that as a guide, the Commission had emphasized four factors of many in cost allocation decisions, including: 1) the party who originally built the crossing; 2) the relative benefits initially conferred by the construction of the crossing; 3) the party who is responsible for the deterioration of the crossing; and 4) the benefits accrued from the reconstruction of the crossing. *Id.* at 52, 791 A.2d at 1163.

13. Not only must the Commission consider all relevant factors, but it must also make specific findings of fact regarding the factors it considered in arriving at its decision. *Greene Township Board of Supervisors v. Pennsylvania Public Utility Commission,* 668 A.2d 615 (Pa.Cmwlth.1995). If we determine that its decision does not address all of the relevant factors in allocating costs, we may remand the matter to the Commission to make such findings of fact and address those factors. *Id.*

14. PECO also argues that the Commission should have conducted a *Wilkes–Barre* analysis of the facts and circumstances related to PECO in this matter. *Wilkes–Barre* is a Commission decision (*Application of the City of Wilkes–Barre,* Docket No. A–101606, filed

April 9, 1981) that was never appealed to this Court. In *Wilkes–Barre,* in allocating relocation costs, the Commission considered the same four factors as in this case: 1) the benefits received by the utility and its rate payers; 2) the availability of state and/or federal funding; 3) placing of costs upon the party responsible for the situation; and 4) the equities of the situation. However, in *Bell Atlantic v. Pennsylvania Public Utility Commission,* 672 A.2d 352 (Pa.Cmwlth.1995), we addressed the same argument raised by Bell Atlantic and stated: "Contrary to Bell's arguments, a review of the Commission's decision in *Wilkes–Barre* reveals that there is no fixed four-part test. The *Wilkes–Barre* decision merely acknowledges that various factors have been used by the Commission in allocating costs and the Commission is 'not limited to any fixed rule, but may consider any *one or more* of the above recited factors, depending upon the facts peculiar to each case.' *Id.,* slip op. at 4 (emphasis in original). This principle has been also accepted by this Court." 672 A.2d at 354. Moreover, as already stated, our Supreme Court in *PECO Energy* held that the Commission had to consider all relevant factors in allocating costs, and it could not im-

Although the City, PGW and PECO contend that there was not substantial evidence to support the Commission's determination because it failed to consider the availability of state and federal funding, placement of the costs upon the party responsible for the situation and the equities of the case, the Commission did give consideration to each of those factors in making its determination. Also, the Commission did consider the detriment to the utilities as well as the benefit in relocating their facilities.

## A. Benefits Received

■ The City, PGW and PECO admit that they have received benefits from the location of their facilities and will continue to benefit after the Bridge is reconstructed. However, they argue that the Commission abused its discretion when it completely disregarded the detriment they faced as a result of the forced relocation because it found that PennDot could not be expected to wait the full life span of a deteriorating Bridge before replacing it. They argue that they presented substantial evidence to show that any benefits they have enjoyed from locating on the Bridge have been deeply offset by the need to prematurely replace their facilities less than midway through their life cycle, and their ratepayers will receive no benefit from the relocation. While the utilities may suffer some detriment, the Commission did not overlook that factor and did take it into consideration when making its decision. Citing *PECO Energy,* the Commission stated:

> The City and PGW also argue that they are hurt rather than helped by the Project because their facilities on the bridge were built in 1955, 1956 and 1966, and

those facilities have an approximate life span of 125 years. (Tr. 125). However, as the Commission stated in a recent case, PennDOT cannot be expected to wait, when public safety is at stake, until the life spans of utility facilities are exhausted, before replacing a deteriorating bridge.

(ALJ's recommended decision dated April 3, 2002, at 18 as adopted by the Commission.) Because the Commission also considered the detriment to the utilities when allocating costs, but determined that the benefits of reconstructing the Bridge and relocation of the utilities' facilities overrode the detriment to the utilities, there was no abuse of discretion.

## B. State and Federal Funding

■ Contrary to the utilities' argument, the Commission did consider the availability of both state and federal funding. It initially found that the Project was going to utilize Bridge bill funds in the amount of 80% federal and 20% state. It then noted that under state law, PennDot was required to reimburse a utility when PennDot required it to relocate facilities from the utility's private right-of-way, 36 P.S. § 670–412, when the municipal utility requested cost sharing, 36 P.S. § 670–412.1, or if the Commission directed it to do so and then it could get reimbursed from the federal government. 66 Pa.C.S. § 2704(a). The Commission found that none of the utilities had facilities in a private right-of-way, or had made a formal request for cost sharing with PennDot and instead recommended that PennDot pay for each of their relocations costs. Further, the Commission was not going to order PennDot to pay the utilities' relocation costs because it agreed with PennDot[15] that if federal

pose a mandatory list of considerations. Therefore, PECO's argument is without merit.

15. Specifically, PennDot argued:
 The impact of the availability of federal funds must be tempered by the reality that

funds were used, the amount of federal funds available for other projects would decrease.[16] What the utilities are really arguing is that the Commission considered the availability of federal funding but did not find it was available to PennDot if PennDot paid their relocation costs. Because the Commission did consider this factor, even though it did not decide it in the utilities' favor, there is evidence to support that it did not merely rely on the benefits the utilities were going to receive in determining the cost allocations but did, in fact, consider other factors as well, including the availability of state and federal funding.

## C. Responsible Party

■ Although the City, PGW and PECO argue that the Commission should have considered that PennDot was the owner of the Bridge, the Commission found that this factor was not helpful in determining the allocation of costs because the Bridge was approximately 83 years old and its deterioration appeared to be the result of its design in 1919 and normal wear and tear; therefore, PennDot was not responsible for the deterioration of the Bridge.[17] Because no evidence was presented to prove that PennDot was responsible for the deterioration of the Bridge, the Commission, while also considering this factor, did not err by not relying upon it in making its determination.

## D. Equities

■ The utilities argue that the Commission failed to even consider the equities of the situation because PennDot will be reimbursed by state and federal funds almost 100% while they will be not be reimbursed at all. However, the Commission specifically found that because PennDot and Conrail were going to share in the estimated $2.3 million Bridge Replacement Project, and PennDot also was going to bear 100% of the costs associated with relocating the City's storm water facility, and the utilities received substantial benefits from the location of their facilities as

such funding is not unlimited. Certainly, reimbursement of the utilities is not appropriate simply because a non-party, the Federal government, will bear a portion of the costs in a project. Rather, as steward of federal funding for highway projects in the Commonwealth, the Department strives to equitably allocate the funding to projects based upon the overall interest of the public. Federal funds available for highway construction costs for the benefit of the citizenry of Pennsylvania will be reduced by payment to the City for relocation expenses, thus negating another worthy highway improvement project.
(Reproduced Record at 39a.)

16. When PECO made this same argument in *PECO Energy*, our Supreme Court responded as follows:

PECO also complains that part of the Commission's reasoning was based on its finding that no federal funds were available to reimburse non-transportation public utili-

ties for their relocation costs. PECO asserts that this is so because the Department, which has adopted a policy that it not pay for relocating non-transportation facilities, circumvents any order to reimburse by the Commission by applying for federal funding for a project prior to any cost allocation hearing. Thus, PECO contends the Department [PennDot] is applying the common law rule and the Commission has turned the policy of the Department into a *de facto* regulation. We cannot agree with PECO on this point. The policies of the Department are not presently before this Court. 568 Pa. at 54, 791 A.2d at 1164.

17. The City and PGW also argue that it is undisputed that the sanitary sewer would remain intact if the Bridge were replaced in the same "footprint" as it currently stands. The only reason that it must be replaced is because PennDot has selected a design for the replacement in which the Bridge abutments would shear through the storm sewer which lies atop it joined by concrete.

did the City residents who traveled the Bridge, it was only fair that the utilities bear some of the costs associated with the Bridge Replacement Project. Again, just because the Commission did not decide this factor in favor of the utilities does not mean that the Commission did not consider it when making the cost allocation determination. The utilities could have avoided such a situation had they agreed to cost sharing, but they did not. Now that they have been awarded 100% of their own relocation costs, they are looking for equity. Unfortunately, their chance for an equitable distribution of their relocation costs has come and gone. Consequently, because the Commission considered all of the relevant factors in determining the relocation costs, it did not err by allocating 100% of each utilities' relocation costs to that utility.

## II.

 The City also argues that the Commission erred in concluding that the sanitary sewer lies within the Holme Avenue public right-of-way, thereby relieving PennDot of any financial responsibility to relocate its facilities involving private property interests. It contends that the sewer lies more than 20 feet below the Bridge deck as well as several feet beneath the Conrail railroad tracks that cross beneath the Bridge. As such, the City argues the sanitary sewer lies within Conrail's private right-of-way, and Penn-Dot is responsible for compensating the City for the damage to its property. Moreover, it contends that Conrail agrees that the sanitary sewer lies within its private right-of-way.

The Commission, however, found that regardless of how it characterized the right-of-way in which its facility existed, the City received the same benefits that accrued to non-carrier utilities with facilities in a public right-of-way. Further, the City did not produce any evidence that it paid for the use of the right-of-way, paid taxes on the property where its facility was located, or that it had purchased the right-of-way. In other words, the City did not show that it had a compensable real property interest that PennDot's Bridge Replacement Project would interfere with. It also did not present any easement or agreement that showed that the City had a real property interest. Because there was no evidence to prove that the City's sanitary sewer lies within the Holme Avenue private right-of-way, the Commission properly determined that the sanitary sewer was within the public right-of-way and PennDot was not responsible for paying for its relocation costs.

Accordingly, the order of the Commission is affirmed.

### ORDER

AND NOW, this 31st day of March, 2003, the order of the Pennsylvania Public Utility Commission dated July 19, 2002, is affirmed.